Filed 1/31/14  In re Annabelle W. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re ANNABELLE W., a Person Coming Under the Juvenile Court Law. | |
| | D064337 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. 518192A-C) |
| v. | |
| C.W., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Amy Z. Tobin, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, Lisa M. Maldonado, Deputy County Counsel, and Georgia A. Gebhardt for Plaintiff and Respondent.

C.W. appeals the juvenile court's judgment terminating her parental rights to her three children and choosing adoption as the appropriate permanent plan.  (Welf. & Inst. Code

§ 366.26.)[1]  C.W. challenges the sufficiency of the evidence supporting the juvenile court's finding that the parent-child beneficial relationship exception to adoption (§ 366.26, subd. (c)(1)(B)(i)) does not apply.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Children's Removal, Detention, and Jurisdiction/Disposition Adjudication*

C.W. is the mother of Gabriella M., Eric W., and Annabelle W.  When these proceedings commenced in August 2011, Gabriella was four years old, Eric was two years old, and Annabelle was about two weeks old.

The San Diego County Health and Human Services Agency (Agency) received eight reports over a period of three years alerting the Agency that C.W. generally neglected the children.  The reports also warned that C.W. had lost custody of three older children in Louisiana, C.W. used drugs, C.W.'s boyfriend sold drugs, C.W. slapped Gabriella on the face in public at a courthouse, Eric had fallen off the stairs and fractured his skull when he was one year old due to C.W. inadequately supervising him, and C.W.'s chaotic lifestyle left her running out of money and supplies for the children.

During the investigation that led to removal, the children were found dirty and hungry.  C.W. did not have enough supplies to meet the children's basic needs through the weekend.

Shortly after the children were removed, Gabriella told social worker Rebecka Tolson she had repeatedly observed C.W. engage in sexual intercourse with Annabelle's father, Arturo

---

1       Further statutory references are to the Welfare and Institutions Code.

2

M.[2] When questioned further, Gabriella revealed she had been sexually abused by Arturo. Tolson also learned C.W. had previously been diagnosed with bipolar disorder and major depression, she struggled with a history of self-mutilation (cutting), and she was not receiving treatment for these conditions.

On August 4, 2011, the Agency filed separate petitions on behalf of each child alleging C.W. failed to provide necessities for the children and had chronic difficulties in doing so. The petitions as to Gabriella and Eric also included allegations regarding Arturo's sexual abuse of Gabriella. The Agency amended the petitions to allege updated information regarding paternity and the fathers' whereabouts.

On August 5, 2011, the juvenile court held a detention hearing, made prima facie findings on the petitions, and ordered the children be detained in out-of-home care. Prior to the contested jurisdiction and disposition hearing, the Agency filed another amended petition on Annabelle's behalf, addressing the risk that Arturo may abuse Annabelle in the same manner in which he abused Gabriella. The court made a prima facie finding on the amended petition.

At the contested adjudication/disposition hearing held on December 9, 2011, the court sustained the amended petitions. The minors were declared dependents of the juvenile court and removed from parental custody. The court ordered the Agency to provide family reunification services to C.W., Arturo, and Timothy M. (Gabriella and Eric's father).[3]

---

[2] Arturo filed a brief pursuant to *In re Sade C*. (1996) 13 Cal.4th 952. We dismissed his appeal on November 1, 2013. We discuss Arturo only as he is relevant to C.W.'s appeal.

[3] Timothy has not appealed the court's eventual termination of his parental rights. We discuss Timothy only as he is relevant to C.W.'s appeal.

About a month later, Gabriella and Eric's new caregiver reported to the Agency that the children were engaging in concerning sexual behaviors and behaving aggressively. During forensic interviews, Gabriella reported she had previously been sexually abused by her father, Timothy. Eric reported only that Timothy had spanked Eric's bottom. These new allegations of sexual abuse led the Agency to file supplemental petitions, but the Agency ultimately requested dismissal of the petitions due to lack of evidence. The Agency planned to address Timothy's alleged sexual abuse in his case plan.

B.      *The Reunification Period*

During the six-month review period, C.W. experienced significant instability in her life. She was unemployed and homeless, occasionally staying at friends' homes or at hotels in Tijuana, Mexico. She also sustained various personal injuries, which caused her to attend child visitations and meetings with social workers in slings, braces, bandages, and casts. C.W. remained in contact with Arturo, who had since been deported to Mexico following his release from incarceration on drug charges.

On June 8, 2012, C.W. was hospitalized for suicidal ideation and self-mutilation. While at the hospital, C.W. reported that she had homicidal ideations towards social worker Tolson and that she would get away with killing Tolson because she knew how to hide the body.

C.W.'s participation and progress in her services declined during this time period, as well. She stopped attending therapy in January 2012 for several months. When she reengaged, C.W.'s new therapist reported she was very defensive and had missed a few sessions. C.W. had also attended only seven sessions of her nonprotective parenting group counseling over the course of six months. The group therapist reported C.W. regularly arrived late, acted annoyed

4

once she was there, declined to participate, and did not like to be present when other group members shared their experiences.

The children's placements changed during the six-month review period. Gabriella and Eric were placed in separate foster homes in March 2012 due to their concerning behavior toward each other. Gabriella initially struggled with her new placement, engaging in tantrums and self-harming behavior such as hitting herself or her caregivers during outbursts. To address these behaviors, Gabriella enrolled in therapy. By the end of the six-month review period, Gabriella had improved in her placement, and her tantrums and self-harming behaviors had decreased. The Agency social worker attributed Gabriella's improvement, in part, to the fact that she received more attention and care from her new caregiver, Elizabeth G.

Eric's concerning behaviors similarly subsided after he was placed at his new foster home and enrolled in therapy. Meanwhile, baby Annabelle continued to thrive and grow at the foster home where she had been placed since the children's initial removal.

The consistency of C.W.'s supervised visits of the children decreased during the six-month review period. The social worker reported that the consistency of C.W.'s visits was acceptable at the beginning of the review period, but the visitation center terminated her visitations in March because she had missed three visits without proper cancellation or excuse. Around this same time, Annabelle's foster mother noted that C.W. began to either show up an hour late to the weekly sibling visits that were held at her home, or would miss the visit altogether without calling to cancel. C.W. also stopped attending her individual visits with Annabelle between March and May. The social worker reported that Gabriella would listen for the doorbell or telephone to ring during visits where her mother was late or simply did not

5

attend and would become visibly disappointed when someone other than her mother would call.

As for the quality of C.W.'s visits with her children, C.W. often struggled to give each child the attention he or she sought. She also struggled to provide the children with structure and boundaries. During an April 2012 visit, C.W. showed the children pictures of Arturo, gave the children toys and stickers from him, and told them he missed them. The social worker explained to C.W. the Agency's concerns about her continued contact with Arturo in light of Gabriella's allegations of sexual abuse. C.W. assured the social worker she would have nothing further to do with Arturo. However, the following month the social worker observed Gabriella playing with new stickers that Gabriella explained were from Arturo.

At the end of the visits, Eric and Annabelle demonstrated limited attachment to C.W.; they did not appear concerned about the visits ending. Gabriella usually requested that C.W. walk her to the car before leaving. Gabriella's and Eric's caregivers reported that the children had increased negative behaviors after visiting with C.W.

At the six-month review hearings in June (for Gabriella and Eric) and August (for Annabelle), the court extended reunification services for C.W.

During the 12-month review period, C.W. continued to experience instability in employment, housing, and her mental and physical health. She was unable to remain in permanent housing and found it difficult to find employment due to her physical injuries. C.W. struggled with her mental health and continued to cut herself as a coping mechanism. She also renewed her homicidal threats towards social worker Tolson, stating she would stab Tolson if she saw her at an upcoming hearing. As a result of C.W.'s threats, the court granted social worker Tolson's application for a restraining order.

6

Prior to July 2012, C.W.'s visits with Gabriella and Eric were inconsistent and visits were discontinued by the Agency. The visits were reinstated at the visitation center. C.W. also visited Annabelle in her foster home and had visits with all three children at Annabelle's foster home, as well. C.W. was on time to visits at the visitation center but was often late to visits at the foster home. At the visitation center, C.W. demonstrated empathy and some knowledge of the children's developmental needs and responded to their needs. She was less successful at the visitations that occurred at the foster home. The Agency reported that "[w]hen given the opportunity to have more forms of visitation or contact with the children (outings with the caregiver, telephone calls, extra visits), [C.W.] has consistently not taken advantage of the opportunities."

Gabriella and Eric enjoyed visits with C.W. and were disappointed when she arrived late or not at all. They were also very disturbed at seeing the injuries to their mother, such as bruising and lacerations. In August 2012, C.W. attended a visit with several visible cuts covering about five square inches of her leg, including one area with the letters "F.T.W." carved into her skin. The children's court-appointed special advocate observed that "[w]hile Gabby and Eric enjoy spending time with their mother during visits, they do not seem sad about leaving [C.W.]." Gabriella and Eric often displayed anxiety symptoms and irritability after visits. Annabelle appeared somewhat indifferent to her siblings and mother during visits.

At the contested 12-month review hearing in November 2012, the court terminated family reunification services as to all three children and set a section 366.26 hearing.

C.    *The Section 366.26 Report, Addenda, and Hearing*

Shortly after the 12-month review hearing, the children were placed together in Gabriella's foster home with caregiver Elizabeth. The children transitioned and adjusted well

7

in Elizabeth's home—Gabriella's and Eric's behavior improved and the children quickly began to look to Elizabeth as a mother figure and relied on her to provide comfort and to meet their needs.

In February 2013, one of C.W.'s friends called adoptions social worker Emre Iscan and reported that C.W. was plotting to kidnap the children and take them to Mexico. According to C.W.'s friend, C.W. was still involved with Arturo. C.W. had also divulged to the friend that she was willing to get her children back at any cost, even if it involved "taking people out." As a result, C.W. was limited to weekly one-hour supervised visits at a visitation center.

C.W. attended visits fairly regularly, but did not attend three visits during January 2013. During the visits, C.W. played with the children and participated in various activities with them, such as reading books or working on puzzles. C.W. brought gifts for the children and prepared breakfast dishes for them. She was also affectionate towards the children and told them she loved them. At times, C.W. struggled to redirect Eric when he misbehaved. C.W. also experienced difficulty tending to all of the children's needs at the same time.

Throughout the reporting period, the children were either indifferent to visiting C.W., or expressed that they did not want to see her prior to attending visitation. Once the children were at the visits, they generally appeared to enjoy visits with C.W.; however, at the end of the visits the social worker supervised, she reported that the children did not demonstrate an adverse reaction toward leaving their mother, but were instead happy to leave with their caregiver. On one occasion, Eric appeared to be equally as excited to see social worker Iscan as he was to see his mother. The children's caregiver reported that at the beginning of 2013, when Gabriella and Eric returned home from a visit, they were often anxious and behaved irritably, but that these behaviors significantly decreased over time. In between visits, the children no longer

8

asked about C.W. On a few occasions, Gabriella reported she had a stomach ache and did not feel well enough to attend visits with her mother.

Social worker Iscan assessed and confirmed that the children were both specifically and generally adoptable. Iscan also confirmed Elizabeth appropriately met all of the children's needs and was willing to adopt them all as a sibling group.

Social worker Iscan also evaluated the bond between C.W. and the children in assessing the children's adoptability. In making this assessment, social worker Iscan reviewed C.W.'s visitation with the children and considered that C.W.'s contact over time had been limited, questionable, and inconsistent. To this end, C.W. had not taken advantage of opportunities for extended visitation with the children even though such opportunities had been offered. Iscan also considered her observations at the visits and opined that the nature of the interactions between C.W. and the children demonstrated more of a "sweet play friend" relationship than a relationship where C.W. held a maternal role. By contrast, Iscan indicated the children looked to Elizabeth as a maternal figure as they relied on her to provide for their physical and emotional well-being. Beyond this, Iscan voiced concern as to the benefits the children would find in maintaining a relationship with C.W. given her poor judgment and lack of insight into the factors that brought the children into custody. For example, Iscan pointed out that C.W. had solicited the children for modeling on the same Web site where she solicited herself for nude modeling and displayed nude photographs of herself.[4] For these reasons, Iscan stated the relationship between the children and C.W. did not rise to the level of a parent-child

_____

[4]     The court ordered C.W. to remove the pictures of the children from the Web site in March 2013.

9

relationship, and the benefits the children received from the relationship did not outweigh the benefits found in adoption.

In June 2013, social worker Iscan reported that Eric suffered a small laceration on his head after he fell while jumping on a bed. Iscan further reported that when she called C.W. to let her know about the injury, C.W. responded with words to the effect of "I need to get me a gun" or "someone get me a gun."

On July 24, 2013, the court held the contested section 366.26 hearing. The court received in evidence a number of Agency reports and addenda, and heard testimony from social worker Iscan, visitation monitor Yolanda C., and C.W.

Social worker Iscan testified that after she was assigned this case in December 2012, she reviewed the files and observed eight visits between C.W. and various combinations of the children. During these visits, Iscan observed the children were excited to see C.W., C.W. interacted and played with the children, C.W. read the children books, and C.W. appeared to be attending to the children's needs. Iscan also testified that during one visit, C.W. told Gabriella the tooth fairy was not real, despite the fact that Elizabeth had told Gabriella the opposite. C.W. then asked Gabriella to choose who she believed. On another occasion, Iscan reported Eric threw tantrums at the end of the visits she observed, but it appeared he was upset about parting with the toys at the visitation center, not parting from C.W.

In addition to these observations, social worker Iscan testified she relied on visitation narratives and statements of other social workers to form her opinion about C.W.'s relationship with the children. Iscan testified she learned from those sources that C.W. was sometimes disinterested in the children during visits; however, she also acknowledged that the visitation

10

monitors often gave C.W. consistent marks for demonstrating a parental role and a knowledge of the children's development needs during visits.

Visitation monitor Yolanda testified about her observations during C.W.'s visits with the children at the visitation center throughout the year leading up to the section 366.26 hearing. Yolanda said the children consistently greeted C.W., referred to her as mommy, and were comfortable in her presence. She also indicated she had given C.W. positive marks for demonstrating a parental role during the visits, noting that C.W. had taken the children to the restroom and inquired about any marks on the children. Yolanda recalled C.W. had made inappropriate comments about the children's caregiver on occasion. Yolanda also testified C.W. focused more on Eric during the visits because of his energy level and that Eric was hard to redirect at times. Yolanda said C.W. and the children would tell one another "I love you" and good-bye at the end of visits. Despite her observations, Yolanda testified she was unable to opine on the nature of the relationship between C.W. and her children.

C.W. testified that her bond with each of her children was strong. She testified Gabriella greeted her with affection, appeared ecstatic during visits, called her mommy, and on occasion stated she wanted to come home with C.W. C.W. acknowledged Gabriella was sometimes anxious and reclusive during visits when she was not the center of attention.

C.W. testified she paid Eric more attention because of the head injury he suffered when he fell off the stairs at age one. She further testified Eric said he missed her, called her mommy, begged to be carried during visits, and was upset by leaving visits. C.W. testified she bonded with Annabelle after removal primarily through breast-feeding.

C.W. testified terminating her parental rights was not in the children's best interests because they would no longer have contact with her or her relatives in Louisiana.

11

On July 26, 2013, after considering the evidence contained in the Agency's reports, the testimony of witnesses, and arguments of counsel, the court found by clear and convincing evidence that the children were generally and specifically adoptable, and that none of the exceptions to adoption found in section 366.26, subdivision (c)(l)(B)—including the parent-child beneficial relationship exception—applied. Accordingly, the court terminated C.W.'s parental rights and found the children's caregiver, Elizabeth, to be a prospective adoptive parent.

C.W. timely appealed.

## DISCUSSION

C.W. asserts the juvenile court erred in finding the beneficial relationship exception to adoption did not apply with respect to Gabriella and Eric. We disagree.

A. *The Beneficial Relationship Exception*

"At a section 366.26 hearing the court is charged with determining a permanent plan of care for the child." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50 (*Casey D*.).) The court may order one of three alternatives: adoption, legal guardianship, or long-term foster care. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*); § 366.26, subd. (b)(1)-(5).) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*Autumn H.*, at p. 573.) Adoption necessarily involves termination of the biological parents' legal rights to the child. (*Id*. at p. 574.) Once the court determines by clear and convincing evidence that a child is likely to be adopted, it becomes the parent's burden to show that termination of his or her rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). (*In re C.F*. (2011) 193 Cal.App.4th 549, 553 (*C.F.*).)

12

The exception at issue here applies when the "parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) In *Autumn H.*, we interpreted the beneficial relationship to mean "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.) We further explained: "In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging to a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid*.)

The showing required to support the beneficial relationship exception is a substantial one.[5] "A biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) After all, "[i]nteraction between natural parent and child will always confer *some* incidental benefit to the child. . . ." (*Autumn H., supra,* 27 Cal.App.4th at p. 575, italics added.) Therefore, "[t]he parent must show he or she occupies a parental role in the

---

5    "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.) This led one court to remark that the beneficial relationship exception "may be the most unsuccessfully litigated issue in the history of law. . . . And it is almost always a loser." (*In re Eileen A.* (2000) 84 Cal.App.4th 1248, 1255, fn. 5.)

child's life, resulting in a significant, positive, emotional attachment between child and parent." (*C.F.*, *supra*, 193 Cal.App.4th at p. 555; *Autumn H.,* at p. 575.)  That "relationship arises from the day-to-day interaction, companionship and shared experiences." (*Autumn H.,* at p. 575.)[6] It is not enough that the parent "demonstrate 'frequent and loving contact[,]' [citation], an emotional bond with the child, or that parent and child find their visits pleasant." (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.)  "One can know a child's interests, enjoy playtime together, and be a loved relative, but not occupy a parental role in the child's life." (*In re Jeremy S.* (2001) 89 Cal.App.4th 514, 523.)  "While friendships are important, a child needs at least one parent.  Where a biological parent . . . is incapable of functioning in that role, the child should be given every opportunity to bond with an individual who will assume the role of a parent." (*In re Brittany C*. (1999) 76 Cal.App.4th 847, 854.)

Whether the beneficial relationship exception applies must be determined on a case-by-case basis. (*Autumn H., supra,* 27 Cal.App.4th at pp. 575-576.)  We review the trial court's determination under the substantial evidence standard. (*Id*. at p. 576.)  "We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts.  Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if

---

6    We clarified in *Casey D.*, *supra*, 70 Cal.App.4th at page 51 that "[d]ay-to-day contact is not necessarily required, although it is typical in a parent-child relationship.  A strong and beneficial parent-child relationship might exist such that termination of parental rights would be detrimental to the child, particularly in the case of an older child, despite a lack of day-to-day contact and interaction."  "The benefit of continued contact between mother and children must be considered in the context of the . . . visitation mother was permitted to have." (*In re Brandon C*. (1999) 71 Cal.App.4th 1530, 1537-1538 (*Brandon C*.).)  But the beneficial relationship exception is "difficult to make in the situation . . . where the parents have [not] advanced beyond supervised visitation." (*Casey D.,* at p. 51.)

other evidence supports a contrary conclusion." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947; *Autumn H.,* at p. 576.)

B.      *Application of the Exception in This Case*

The first prong of the beneficial relationship exception requires the parent to prove she maintained regular visitation and contact with the children. (§ 366.26, subd. (c)(1)(B)(i).) Here, although the juvenile court found that C.W. "never moved beyond visitation with the children in a supervised setting" due exclusively to her own behavior,[7] the court nonetheless concluded C.W. "minimally proved" the first prong. We therefore address whether substantial evidence supports the juvenile court's determination that C.W. failed to carry her burden on the second prong—that "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.)

C.W. argues, essentially, that the juvenile court should have credited the visitation monitor's testimony more than the social worker's recommendations. As described above, visitation monitor Yolanda testified the children consistently greeted C.W., referred to her as mommy, and were comfortable in her presence. Yolanda also stated she had given C.W. positive marks for demonstrating a parental role during the visits. Yolanda also testified C.W. and the children would tell one another "I love you" and good-bye at the end of visits.

C.W. also asserts social worker Iscan's own observations and testimony further support that C.W. established the beneficial relationship exception. For example, Iscan acknowledged

_____

[7]     The court identified that behavior as follows: "lack of advancement in services, and in part as well due to her inappropriate conduct with social workers, threatening conduct with social workers, and . . . making arrangements to kidnap the children."

15

visitation monitors gave C.W. consistent marks in the visitation narratives regarding her demonstration of a parental role, the children eagerly greeted C.W. at visits, called her mommy, and were affectionate toward C.W.

C.W. argues this evidence is similar to the evidence upon which the beneficial relationship exception was established in *Brandon C.* But *Brandon C.* is procedurally distinguishable. There, the juvenile court had applied the beneficial relationship exception and the Court of Appeal's task was to determine whether substantial evidence supported that finding. (*Brandon C.*, *supra*, 71 Cal.App.4th at pp. 1533-1534.) Here, we apply the substantial evidence standard to the juvenile court's decision *not* to apply the exception. We conclude substantial evidence supports that decision.

By the time of the section 366.26 hearing, social worker Iscan had observed eight visits. She testified that although the children called C.W. mommy, they also called caregiver Elizabeth mommy and were happy to leave with Elizabeth at the end of visits. On occasion, Eric was as happy to see Iscan as he was to see C.W. Iscan also reported the children did not ask about C.W. between visits. Gabriella and Eric had become indifferent to attending visits with C.W. and, at times, would even express that they did not want to attend. Gabriella and Eric often exhibited anxiety before and after visits with C.W. Finally, Gabriella no longer became upset when she did not see C.W. and even stated C.W. "forgets about us a lot . . . ."

On balance, Iscan's observations led her to conclude C.W.'s relationship with the children was not parental but, rather, was that of a "sweet play friend." Although the court stated "it wouldn't be the Court's choice to use the term 'sweet play friend,' " the court nonetheless agreed with Iscan's conclusion that C.W. had not established a sufficiently parental role with the children to prevent adoption. Social worker Iscan's testimony, reports, and

16

expertise constitute substantial evidence upon which the juvenile court was entitled to rely. (*Casey D.*, *supra*, 70 Cal.App.4th at p. 53 ["The trial court was entitled to find the social worker credible and to give greater weight to her assessments and testimony."].)

To the extent C.W. is asking us to reweigh Iscan's testimony against Yolanda's, we decline to do so.[8]  (*Casey D.*, *supra*, 70 Cal.App.4th at p. 53.)  We also decline C.W.'s invitation to reweigh the inferences to be drawn from "the children's ease in parting from their mother."  (*In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 947 ["we draw all reasonable inferences in support of the findings"].)

C.W. argues her relationship with her children "must be considered in the context of the . . . visitation [C.W.] was permitted to have."  (*Brandon C.*, *supra*, 71 Cal.App.4th at pp. 1538, 1537; *Casey D.*, *supra*, 70 Cal.App.4th at p. 51 ["Day-to-day contact is not necessarily required . . . ."].)  In doing so, however, we need not ignore that C.W.'s visitations were structured in the ways they were due exclusively to her own behavior,  and that C.W. failed to avail herself of all visitation opportunities she was offered or to seek additional opportunities.

We are unpersuaded by C.W.'s assertion that her parental rights should not have been terminated because Gabriella and Eric "had lived a significant portion of their lives" with C.W. They had also spent a significant portion of their lives detained from her—nearly two years, by

---

8     The juvenile court found it significant that Yolanda was unable to characterize the nature of C.W.'s relationship with her children despite observing a year's worth of visits.  At oral argument, the trial court inquired of C.W.'s counsel:  "So your argument is essentially that . . . the Court should give little weight to the social worker's assessment because she's only had two opportunities to observe the visits, and there's a person who has observed many more who . . . didn't find herself in a position to be able to categorize the bond?"  C.W.'s counsel responded, "Right."

the time of the section 366.26 hearing. Moreover, according to the Agency's detention report, even before the children were detained, C.W.'s mother "informally cared for Gabriella and Eric approximately three times since Gabriella's birth," for two to four months at a time, which totals an additional six to 12 months away from C.W.

In contrast to the instability they had experienced with C.W., substantial evidence establishes that the children have benefited from their placement with caregiver Elizabeth. Gabriella and Eric both stopped engaging in sexualized behavior and Gabriella stopped engaging in self-harming behaviors. The court noted that all of the children flourished and thrived under the consistent and stable care of Elizabeth, and remarked that Gabriella had made extraordinary advancements in the placement. Moreover, the evidence showed that the children had the opportunity to be adopted as a sibling set by Elizabeth.

Based on all the circumstances, substantial evidence supports the juvenile court's determination that "the benefits of adoption clearly and significantly outweigh the benefits of maintaining the parent-child relationship."

DISPOSITION

The judgment is affirmed.


McCONNELL, P. J.

WE CONCUR:


McDONALD, J.


IRION, J.

18